# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

OSWALDO GONZALEZ,                    )
                                     )
    Plaintiff,               )
                                     )       No. 13 CV 5766
    v.                        )
                                     )       Hon. Charles R. Norgle
SALEH OBAISI, et al.,                )
                                     )
    Defendants.               )

## OPINION AND ORDER

Plaintiff Oswaldo Gonzalez ("Plaintiff") sues Stateville designated healthcare provider

Wexford Health Sources, Inc. ("Wexford"); Dr. Saleh Obaisi ("Obaisi"); Physician Assistant

Latonya Williams ("Williams"); former Stateville Acting Warden Marcus Hardy ("Hardy") and

former Stateville Grievance Counselor Landria Dennis ("Dennis") (together, the "IDOC

Defendants"); Stateville Correctional Center Lockdown Coordinator John Doe and Stateville

Correctional Officer John Doe (together, the "Doe Defendants") (collectively, "Defendants") for

violating Plaintiff's constitutional liberties pursuant to 42 U.S.C. § 1983. Before the Court are

Wexford's motion to dismiss and the IDOC Defendants' motion to dismiss Plaintiff's First

Amended Complaint ("Complaint"). Obaisi and Williams answered the Complaint and thus do

not have pending motions to dismiss before the Court. The Court addresses both the Wexford

and IDOC motions in this opinion, and, for the following reasons, both motions are granted.

## I. BACKGROUND

Plaintiff filed his initial *pro se* complaint on August 13, 2013. The allegations concerned

a July 17, 2012 accident in which Plaintiff, with his hands cuffed behind his back, slipped and

fell headfirst down a flight of stairs. Plaintiff specifically spelled out a twenty-one-day delay in

medical care and the alleged inadequacy of the care that the medical professionals eventually provided. After the Court's initial screening pursuant to 28 U.S.C. §1915A, the Complaint proceeded against Obaisi and Williams, but Hardy and several other defendants were dismissed. Along with his initial complaint, Plaintiff moved to proceed *in forma pauperis*. Plaintiff's motion was granted on September 17, 2013.

Plaintiff later submitted two motions for appointment of counsel—the first on May 1, 2014 and, while the first motion was pending, the second on October 1, 2014—due to his incarceration, limited legal acumen, and scarce access to the law library because of administrative segregation. Before the Court ruled on Plaintiff's motions, Obaisi and Williams moved for summary judgment on October 31, 2014. On December 19, 2014, the Court initially denied the motions for appointment of counsel without prejudice, with the caveat that the Court would examine the summary judgment briefs to determine whether the absence of counsel prejudiced Plaintiff. On March 23, 2015, the Court ultimately denied the summary judgment motion without prejudice and determined that complicated medical and legal issues necessitated counsel for Plaintiff. The Court recruited Plaintiff's present counsel on March 30, 2015 and ordered counsel to confer with Plaintiff within sixty days and report back to the Court as to additional discovery needed to proceed with the case. The parties appeared for several status hearings, and on January 8, 2016, the Court granted Plaintiff leave to file this Complaint, which Plaintiff submitted on February 25, 2016. The Complaint renamed Hardy and added Wexford and Dennis as defendants for the first time.

Plaintiff's Complaint alleges that on July 17, 2012, Plaintiff fell headfirst down a flight of stairs with his hands cuffed behind his back. Physician Assistant Williams examined Plaintiff that day. Plaintiff sustained injuries to his head and knee, which also prevented him from

answering certain questions asked by Williams. The injuries left Plaintiff with head swelling, blurred vision, nausea, and headaches. The Complaint alleges that Williams provided a cursory examination and that Plaintiff had a conversation with Hardy in the infirmary that same day. Williams gave Plaintiff two Tylenol and a walking crutch. For twenty-one-days thereafter, Defendants allegedly deprived Plaintiff of medical care despite Plaintiff's repeated medical requests and grievances, complaining of headaches, nausea, blurred vision, dizziness, knee pain, and the lack of response by and care from various Defendants.

From July 18, 2012 through August 8, 2012, Stateville was on lockdown. Plaintiff alleges that during lockdowns, the healthcare staff at Stateville is responsible for ensuring daily access to medical care for prisoners. Specifically, the Chief Administrative Officer, Hardy in this case, appoints a lockdown coordinator, who is responsible for ensuring daily access to medical care. As to sick call requests, the healthcare staff responds to inmate submissions. Plaintiff also states that responses to emergency medical requests and ensuring that inmates are timely seen by medical professionals fall under the purview of the healthcare staff.

Beginning on July 18, 2012, the day immediately following the fall, through August 5, 2012, Plaintiff filed a series of medical requests and grievances. In total, Plaintiff alleges that he submitted twelve medical requests and four grievances. Dennis reviewed each of the grievances, and the grievances were forwarded to the Health Care Unit. Notably, Plaintiff directed only one such communication, an emergency grievance, to Hardy's attention. That occurred on July 20, 2012, just three days after the accident and Plaintiff's initial medical examination and Hardy's visit with Plaintiff in the infirmary. That grievance sought additional medical care for the injuries suffered from the fall. Therein, Plaintiff explained the treatment provided on the day of the fall and added that doctors informed him that headaches and pain could last for up to two

3

months after the fall.  The grievance stated Plaintiff was not provided with medication upon leaving the Health Care Unit and that his crutch was taken away.  The Complaint does not indicate whether the crutch was removed for medical purposes or penological concerns.  Plaintiff asserts that Hardy allowed the grievance to lie dormant for nearly one and a half months before responding on September 4, 2012.  The Complaint does not elaborate as to the particular responsive actions taken by Hardy.  The delay and inadequacy of the eventual treatment allegedly exacerbated Plaintiff's condition.

On August 8, 2012, Plaintiff vomited in the cafeteria.  Obaisi examined Plaintiff that same day.  This was Plaintiff's second time being treated by a medical professional, but the first time Obaisi provided Plaintiff with medical care.  The Complaint alleges that after Obaisi treated Plaintiff, the medication Obaisi prescribed exacerbated previous symptoms and caused side effects, including seizures.  Plaintiff alleges that he then submitted several additional medical requests beginning on August 12, 2012, but it is unclear from the Complaint to whom such requests were directed.  On August 29, 2012, Plaintiff suffered a seizure, and Obaisi again examined Plaintiff with a CT scan and treated Plaintiff with anti-seizure and pain medication.  Plaintiff sent a medical request on November 26, 2012 explaining that he had not received headache medication prescribed by Obaisi.  On January 18, 2013, Obaisi prescribed a pain reliever for Plaintiff.  Although Obaisi prescribed a different pain reliever, Plaintiff alleges that he continues to suffer from these symptoms and seizures.  Despite the alleged continuing ailments, the allegations do not reflect any further grievances or medical requests, emergency or otherwise, submitted by Plaintiff after August 5, 2012.

The Administrative Review Board ultimately denied Plaintiff's grievances and then his appeal on June 6, 2013. Plaintiff's last day of incarceration at Stateville was August 13, 2013, the day on which he filed his initial complaint.

## II. DISCUSSION

### A. Standard of Review

A motion under Rule 12(b)(6) tests the sufficiency of the complaint under the plausibility standard, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), not the merits of the suit, Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990) (citation omitted). "[A] plaintiff's claim need not be probable, only plausible: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" Indep. Trust corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 935 (7th Cir. 2012) (quoting Twombly, 550 U.S. at 556). "To meet this plausibility standard, the complaint must supply 'enough fact to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." Id. (quoting Twombly, 550 U.S. at 556). In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in a plaintiff's complaint and draws all reasonable inferences in his favor. Burke v. 401 N. Wabash Venture, LLC, 714 F.3d 501, 504 (7th Cir. 2013) (citations omitted).

### B. The Claims Against Wexford and Dennis Are Barred by the Statute of Limitations

Plaintiff alleges deliberate indifference to his serious medical needs in violation of the Eighth Amendment. All individuals are sued in their individual capacities. Plaintiff sues Wexford under two theories of liability. First, Plaintiff asserts that Wexford maintained a policy, procedure, or practice at Stateville whereby its employees routinely ignored and refused to respond to inmate requests for medical care during Stateville lockdowns. Second, Plaintiff

alleges that Wexford is liable under the doctrine of *respondeat superior* for Obaisi and Williams'

actions within the scope of employment and under Wexford's supervision. Both Wexford and

Dennis argue that the applicable statute of limitations bars Plaintiff's claims.

Generally courts do not dismiss claims as untimely on motions to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6). Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir.

2006) (citations omitted). Rule 8 instead does not require that a complaint "anticipate or

overcome affirmative defenses such as the statute of limitations." Id. The general rule

notwithstanding, "dismissal under Rule 12(b)(6) on the basis of a limitations defense may be

appropriate when the plaintiff effectively pleads [himself] out of court by alleging facts that are

sufficient to establish the defense." Id. However, provided that there exists "a conceivable set of

facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions

of timeliness are left for summary judgment (or ultimately at trial), at which point the district

court may determine compliance with the statute of limitations based on a more complete factual

record." Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc., 782 F.3d 922, 928 (7th

Cir. 2015) (citations omitted). Because there is a sufficient factual record before the Court, the

Court can rule at this early stage.

The law treats § 1983 actions "as personal injury claims and [§ 1983] actions are

governed by the personal injury statute of limitations and tolling laws in the state where the

alleged injury occurred." Delgado-Brunet v. Clark, 93 F.3d 339, 342 (7th Cir. 1996); Wilson v.

Giesen, 956 F.2d 738, 740 (7th Cir. 1992) (citing Wilson v. Garcia, 471 U.S. 261, 279 (1985)).

Under Illinois law, the statute of limitations for personal injury is two-years. Delgado-Brunet, 93

F.3d at 342; 735 ILCS 5/13-202. Federal law, however, determines the accrual of the cause of

action. Giesen, 956 F.2d at 740 (citations omitted). Civil rights claims accrue when the plaintiff

knows or should know that his constitutional rights have been violated. Id. (citations omitted); Behavioral Inst. of Indiana, LLC v. Hobart City of Common Council, 406 F.3d 926, 929 (7th Cir. 2005). The Court must first determine the injury and then the date on which the plaintiff could have sued. Savory v. Lyons, 469 F.3d 667, 672 (7th Cir. 2006) (citation omitted). That date supplies the time at which the plaintiff knew or should have known of the constitutional violation. Id.

### i. The Accrual Date For Plaintiff's Claim Is August 13, 2013

Both Wexford and Dennis argue that Plaintiff's claim should accrue on August 8, 2012, the date on which Plaintiff obtained medical care after the alleged twenty-one day delay. Wexford and Dennis also acknowledge (and Plaintiff claims), however, that the latest possible accrual date is August 13, 2013, which is the date Plaintiff left the place of confinement. Wexford Mot. at p. 6, ¶ 16; IDOC Def.s' Mot. at 4; Pl.'s Opp. at 6. In light of this acknowledgement and drawing all inferences in favor of Plaintiff, as the Court must in the posture of this case, the Court applies August 13, 2013 as the accrual date for Plaintiff's cause of action.

### ii. Equitable Tolling Does Not Apply In This Case

Having established the accrual date as August 13, 2013 (at least in the current posture of the case), the two-year limitations period expired on August 13, 2015. Plaintiff brought his claims against both Wexford and Dennis on February 25, 2016.[1] Accordingly, the statute of limitations must have been tolled for at least 196 days in order for Plaintiff's claims against Wexford and Dennis to survive. Federal courts apply state tolling rules in § 1983 claims. Savory, 469 F.3d at 672; see also Quinn v. Harris, 230 F. App'x 595, 597 (7th Cir. 2007). At

---

[1] Wexford and Dennis state that Plaintiff brought his claims against them on February 26, 2016. The docket, however, reflects that the Complaint naming these defendants was filed on February 25, 2016.

one point, the law of this circuit was unclear as to whether courts were to supplement state equitable tolling rules with federal equitable tolling rules. Shropshear v. Corp. Counsel of City of Chicago, 275 F.3d 593, 595-96 (7th Cir. 2001) (citing cases) (discussing the discrepancy among Seventh Circuit decisions). The Seventh Circuit has since resolved the matter by concluding that, "in conformity with all the appellate cases in other circuits that have addressed the issue, that the state, rather than the federal, doctrine of equitable tolling governs cases of borrowing." Id. at 596 (citing cases). Additionally, the Seventh Circuit has, at times, expressed uncertainty that the doctrine of equitable tolling exists in Illinois. Id. (citing cases). Recent cases, however, continue to apply the doctrine in limitations analyses. See e.g., Rosado v. Gonzalez, 832 F.3d 714, 717 (7th Cir. 2016) (citing Clay v. Kuhl, 727 N.E.2d 217, 223 (2000)); Bryant v. City of Chicago, 746 F.3d 239, 243 (7th Cir. 2014) (citing Illinois and federal cases).

Equitable tolling "may apply . . . if the plaintiff has been prevented from asserting his or her rights in some extraordinary way.'" Rosado, 832 F.3d at 717 (citing Kuhl, 727 N.E.2d at 223). Otherwise formulated, where the plaintiff, despite exercising reasonable diligence, cannot discover his injurer's identity within the limitations period, equitable tolling may apply to postpone the deadline for bringing suit until the plaintiff can obtain the required information. Bryant, 746 F.3d at 243. Additionally, the Court must weigh factors that favor equitable tolling against prejudice to the defendants caused by the delay. Donald v. Cook Cty. Sheriff's Dep't.,, 95 F.3d 548, 562 (7th Cir. 1996).

The Court turns to Plaintiff's argument that the statute of limitations tolled for the 333 day period between Plaintiff's initial motion for appointment of counsel and the Order granting that motion. Plaintiff asserts that Seventh Circuit precedent compels the equitable tolling of the statute of limitations during the pendency of a *pro se* plaintiff's motion seeking the appointment

of counsel. The parties cite several Seventh Circuit opinions, none of which avails Plaintiff on the facts giving rise to his cause of action.

In <u>Bryant v. City of Chicago</u>, an Illinois inmate appealed the dismissal of his untimely § 1983 action. 746 F.3d at 241. The plaintiff in that case argued that the district court inappropriately refused to equitably toll the statute of limitations when his incarceration and lack of legal and financial resources prevented him from timely filing his false-arrest and false-imprisonment claims. <u>Id.</u> at 242. The plaintiff also asserted that the district court abused its discretion when it did not rule upon the plaintiff's motion to compel the City of Chicago to disclose his arresting officers' names and that his diligence in seeking those officers' names supplied the court with ample basis to toll the limitations period. <u>Id.</u> The Seventh Circuit agreed with the plaintiff and held that the district court erred in declining to toll the statute of limitations because the plaintiff displayed reasonable diligence in his efforts to obtain the missing information. <u>Id.</u> at 243. The court reasoned that the plaintiff could not move forward with the case until he received the identifying information requested in his motion to compel, and "this discovery request would have provided [the plaintiff] with the only additional information that he needed to amend his complaint in a timely manner and to name properly his defendants." <u>Id.</u> at 243-44.

Plaintiff overstates the precedential value of <u>Bryant</u>. While the Seventh Circuit recognized that equitable tolling *can* be appropriate while a *pro se* plaintiff awaits a decision on his motion to appoint counsel, the appellate court did not create a bright line rule. <u>See id.</u> at 233 (emphasis added). The context of this case is materially distinguishable. First, the unknown parties in <u>Bryant</u> were two unnamed police officers in connection with false arrest, false imprisonment, and malicious prosecution claims. <u>Id.</u> at 241. With respect to Dennis, Plaintiff

alleges that he submitted four grievances, each of which Dennis reviewed and forwarded to the Health Care Unit. Compl. at ¶¶ 43-44. As to Wexford, Plaintiff was able to name the company's employees. The field officers at issue in <u>Bryant</u> may be particularly difficult to identify given the vast number of officers employed by the City of Chicago (the employer at issue) and the tumultuous context of an arrest. Here, however, Dennis was a person designated to handle the very complaints Plaintiff chose to submit. Plaintiff specifically alleges that Stateville grievance procedures require grievance counselors to review grievances and forward them to the Health Care Unit. Identifying Dennis as a grievance counselor would not require substantial effort since she worked as one such grievance counselor at Stateville. Plaintiff's Complaint explicitly states his knowledge that Dennis actually reviewed and forwarded the four grievances to the Health Care Unit. Regarding Obaisi and Williams, they were individuals with whom Plaintiff had treating relationship and who had direct nexus to Wexford. Identifying their proper employer given Plaintiff's knowledge of the individuals' identities and the direct nexus between the treating medical professionals and Wexford would also require minimal investigation. Plaintiff, however, did not take any steps to procure this information and waited more than two and a half years to name Wexford and Dennis in his amended complaint. Accordingly, these factors weigh against finding the level of diligence required to equitably toll the limitations period.

Moreover, in <u>Bryant</u>, the court explicitly stated that plaintiff could not proceed with his case prior to receipt of the information sought by his motion to compel. 746 F.3d at 243-44. The plaintiff therefore could do nothing while awaiting the district court's decision on his motion. Here, a motion to appoint counsel does not guarantee identifying information in same way as a motion to compel specifically tailored to reveal the identity of individuals. Plaintiff ultimately

fails to articulate any reason why he could not identify Dennis as a grievance counselor or Wexford as Obaisi and Williams' correct employer absent the appointment of counsel. In fact, Plaintiff argues exclusively that tolling is compelled by the time period between his motion for appointment of counsel and the granting of that motion without providing any explanation of actions he took to identify these newly added parties. Although the Court is cognizant of the *pro se* plaintiffs' limitations with respect to obtaining information, id. at 243, there is no reason to believe that Plaintiff could not have filed a motion to compel or sought the information administratively through the prison system had he so desired, as Plaintiff engaged in discovery prior to the appointment of counsel.

The Bryant plaintiff also named the missing officers as John Doe and Richard Roe in his initial complaint. Id. at 241. This demonstrates that the Bryant plaintiff had certain individuals in mind that he could name, but for the district court disregarding his motion to compel. Although Plaintiff identified a John Doe in the original complaint, he specified that the unknown defendant was a tactical unit supervisor; Plaintiff never cited an unknown grievance officer in the initial complaint. Nor did Plaintiff name any employing entity for Obaisi and Williams such as IDOC in his initial complaint.[2] Therefore, Plaintiff's original complaint evinces that neither Dennis nor Obaisi and Williams' employer were even on his radar when filing this action. In turn, there is no reason to believe Plaintiff failed to name them due to his inability to obtain their proper identities.

Plaintiff also cites Savory and Donald which are equally unavailing. Savory does no more than cite Donald for the discretionary standard that equitable tolling "*may* [apply] . . . if the appointment of counsel is pending." Savory, 469 F.3d at 673 (emphasis added). That case,

_____

[2] In his brief, Plaintiff argues that he mistakenly believed Obaisi and Williams worked for IDOC. Pl.'s Resp. in Opp. at 3. However, there is no indication that Plaintiff originally intended to name an employing entity because the initial complaint fails to name IDOC or any other potential employing entity.

11

however, centered on the plaintiff's assertion that the government refused to grant him access to physical evidence for purposes of DNA testing, and none of the plaintiff's tolling arguments relied upon a pending motion for appointment of counsel. See id. at 674 (setting forth the plaintiff's claimed bases for equitable tolling). Furthermore, the Savory court declined to equitably toll the statute of limitations. Id.

Finally, Donald is materially distinguishable in several ways, which renders it inapposite to the instant case. As an initial matter, the extraordinary circumstances outlined in Donald are both different and more substantial than those claimed in the case at bar. The Seventh Circuit explained that the plaintiff's difficulties were attributable "in considerable part" to the way the district court handled the case. Donald, 95 F.3d at 554. In particular, the plaintiff failed to name any individual officials, instead, naming only the department itself to whom liability cannot attach pursuant Monell v. Dept. of Social Services, 436 U.S. 658 (1978). Donald, 95 F.3d at 551. Despite the plaintiff's *pro se* status and failure to name any individual defendants as required to sustain a claim, the district court did not liberally construe the facially meritorious complaint and provide ample opportunity for the plaintiff to amend the complaint to make it legally viable. Id. at 554-55. In this case, Plaintiff did not misunderstand the need to include individual defendants, as he named individual defendants in his initial *pro se* complaint. Moreover, Plaintiff does not contend that he did not understand the need to name an employing entity in order to state a Monell claim; rather, Plaintiff in his brief states that he mistakenly failed to identify the proper employer of the doctor and physician's assistant whose names he clearly knew.

The failure to include *any* individuals as named defendants in Donald provides a critical distinction from the failure to include Dennis in the initial complaint. A court need not wait for a

*pro se* plaintiff to discover his legal error when he is "required to sue the individual defendants *in order to maintain a cause of action.*" Id. at 557 (emphasis added). Here, Plaintiff indeed named individual defendants, and thus maintained his cause of action. A court's vigilance with respect to enabling a *pro se* plaintiff to maintain a cause of action at all is materially different from the vigilance required to ensure a *pro se* plaintiff names each and every potential individual defendant.

Aside from the initial complaint, the plaintiff in Donald submitted additional pleadings that, although not styled as an amended complaint, were "obviously intended to amend the complaint." Id. at 552. The district court dismissed the case and did not address the plaintiff's attempts to add individual defendants until it denied the plaintiff's motion to reconsider. Id. at 553. Additionally, "the district court's tolerance of the [defendant's] unexplained and lengthy delay in responding to the complaint; [] the court's own delay in ruling on [the plaintiff's] motions for appointment of counsel; and [] its failure to make any explicit rulings on [the plaintiff's] motion to amend his complaint" in large part caused the timeliness issues. Id. at 554-55. The instant case is different with respect to these issues. While there were motions for appointment of counsel pending, the Court did not delay in addressing those motions. Nor did any of the Defendants delay in responding to the complaint, and therefore the Court did not "*sua sponte* enlarge[] the time period for the [defendants] to respond to the complaint. . . ." Id. at 558. Perhaps more importantly, Plaintiff never attempted to amend his complaint without counsel, styled as a motion to amend or otherwise, in order to add Dennis or Wexford.

The Seventh Circuit opinion does note that the plaintiff's motion to amend his complaint "came rather late in the game," id. at 557, and the nominal statute of limitations had expired by the time the plaintiff mailed his motion to amend the complaint to add individual defendants, so

his claims might have been time-barred. Id. at 560. Nonetheless, the plaintiff in Donald demonstrated a diligent effort in pursuing his claims. See id. ("[H]is claims . . . might well have been time-barred. Therefore, we focus on whether the amendments [the plaintiff] proposed would have met the statute of limitations requirement, either through [] relation back or through equitable tolling."). This is particularly true in light of the fact that the district court substantially delayed in addressing the plaintiff's motions for appointment of counsel and ultimately denied the plaintiff's requests. Id. at 552, 562. The plaintiff filed his complaint on January 27, 1993, roughly three weeks before the expiration of the limitations period. Id. at 551. There, the plaintiff simultaneously moved for appointment of counsel, but the court did not take action on the motion for appointment of counsel until September 13, 1993—well after the statute of limitations had expired—when the court denied the motion. Id. at 552. The plaintiff filed a second motion for appointment of counsel on September 24, 1993, which the district court again rejected on October 15, 1993. Id. at 553.

In the instant case, by contrast, the Court promptly screened Plaintiff's original complaint about one month after filing. Upon screening that complaint, the Court told Plaintiff that he could not sue certain of the named individuals, and Plaintiff proceeded to wait nearly seven and a half months to move for appointment of counsel. Plaintiff's delay notwithstanding, the Court was able to recruit counsel for Plaintiff on March 30, 2015—roughly four and a half months prior to the statute of limitation's expiration. The Court's March 23 Order specifically directed recruited counsel to confer with the Plaintiff within 60 days and report to the Court as to additional discovery needed to proceed. This reflects that counsel and Plaintiff had considerable time to contemplate naming new defendants. Thus, even absent Plaintiff's own efforts, he had

14

ample opportunity to seek guidance from counsel had he believed that he needed to name, but could not identify, Dennis or Wexford.

The Seventh Circuit ultimately concluded that, on remand, the court should *consider* whether these circumstances—"the district court's delay in considering, and eventual denial of, his motion for appointment of counsel, *combined with* the lack of any notice to [the plaintiff] that he had sued the wrong defendants, [which] helped to ensure that his ignorance of the identifies of the unknown officials would continue." Id. at 562 (emphasis added). Thus, to summarize, the only conceivable factor weighing in favor of Plaintiff is that a motion for appointment of counsel was pending. The other factors discussed by the Donald court are not present in this case.

For the foregoing reasons, equity is not served by tolling the statute of limitations. Wexford points to the undue prejudice it would sustain on account of defending an action initiated nearly three years ago because of the substantial discovery that has already taken place and the costly discovery that a Monell claim would require. Because Plaintiff fails to demonstrate the requisite diligence for equitable tolling, the Court does not evaluate Wexford's argument. Additionally, the Court does not reach Plaintiff's argument that equitable tolling should apply for the thirty-five day period between Plaintiff's motion to proceed *in forma pauperis* and the Court's ruling on that motion because thirty-five days is not sufficient to save Plaintiff's claims against Wexford and Dennis.

### iii. Plaintiff's Claims Against Wexford Do Not Relate Back to the Date of His Original Complaint

The Court next addresses Plaintiff's argument that the claims against Wexford relate back to Plaintiff's original *pro se* complaint filed on August 13, 2013. Plaintiff does not argue that his claims against Dennis relate back. Federal Rule of Civil Procedure 15 controls amended

pleadings. Rule 15(c)(1)(C) allows an amended complaint to relate back to the date of the original pleading when (1) the amendment changes the party or the naming of the party against whom a claim is asserted; (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; and (3) within the time period provided by Rule 4(m) for service of the summons and complaint, the new party both (a) received such notice of the institution of the action so that the party is not prejudiced in defending the case on the merits; and (b) the new party knew or should have known that, but for the plaintiff's mistaken identity of the proper party, the action would have been brought against the new party. Fed. R. Civ. P 15(c)(1)(C); <u>Eison v. McCoy</u>, 146 F.3d 468, 471 n. 3 (7th Cir. 1998).

Plaintiff's primary argument is that <u>Stewart v. Mesrobian</u>, No. 12 C 50273, 2015 WL 685708 (N.D. Ill. Feb. 18, 2015) compels the application of the relation back doctrine. The court in <u>Stewart</u> found the relation back doctrine appropriate in order to save the plaintiff's claims also against Wexford. <u>Id.</u> at *4. Although the case contains certain similarities, including Wexford's presence, the distinct facts at play in this case prevent Plaintiff from meeting the requirement that Wexford knew or should have known that the action would have been brought against it, but for a mistake concerning the proper identity.

The <u>Stewart</u> court, in a "closer call," found that Wexford should have known it could have been named in the original complaint but for the plaintiff's mistake. <u>Id.</u> at *5. In that case, although the original *pro se* complaint did not name the correctional center, it mistakenly identified the correctional center as the doctor's employer in the allegations stated in the complaint. <u>See id.</u> Thereafter, the plaintiff learned that Wexford actually employed all medical directors at the facility. <u>Id.</u> The court found that this supported a finding that Wexford should

16

have known that it could have been brought in the suit. Id. Here, as discussed above, Plaintiff did not name IDOC as Obaisi and Williams' employer in his original complaint. But, the important difference in this case is that, unlike the allegations in Stewart, Plaintiff's allegations do not refer to IDOC or any other potential employing entity as Obaisi and Williams' employer.

The more crucial distinguishing factor in Stewart, however, is that the decision in that case relied on the fact that the plaintiff set forth what appeared to be a Monell claim in his original complaint. That complaint alleged that IDOC had a "*policy* of contouring inmates into the black box restraint" solely in order to torture the inmates. Id. (emphasis added). The court concluded that "it appear[ed] as though plaintiff was attempting to allege a Monell claim regarding the use of Black Box restraints . . . [which was] similar to the claim plaintiff ha[d] asserted against Wexford in the second amended complaint." Id.

Here, as Wexford points out, Plaintiff's original complaint contains no allegations relating to any policy or practice whatsoever. Plaintiff's brief argues that his original prayer for relief seeking "[d]eclaratory and injunctive relief prohibiting current and future employee[]s from violating [his] constitutional [r]ights and proper medical treatment and diagnosis through orthopedic Dr.," Original Complaint at 11, constitutes "allegations regarding Wexford employees and the effect of policies and practices within Stateville." Pl.'s Mem. in Opp. at 9. These allegations, however, come nowhere near stating a colorable Monell claim in the manner stated by the allegations at issue in the Stewart case. The Stewart allegations explicitly referred to a "policy" and articulated how that policy was carried out. See Stewart, 2015 WL 685708 at *5. Thus, the broad request for a prohibition of constitutional rights violations and proper medical care could not have been expected to alert Wexford that it might need to defend against a Monell claim, but for a naming error in the initial complaint.

17

In sum, Plaintiff's Complaint attempts to sue Wexford and Dennis three years after his alleged injury occurred. This attempt fails. The Court rejects Plaintiff's equitable tolling and relation back arguments. Thus, the claims against both Wexford and Dennis are dismissed. Should Plaintiff later name the Doe Defendants, they may have similar statute of limitations defenses.

## B. Plaintiff's Allegations Against Warden Hardy Fail to State a § 1983 Claim

The Court now addresses whether Plaintiff has pled facts sufficient to sustain a claim for deliberate indifference against Hardy. The Eighth Amendment serves to protect prisoners "against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015). To maintain an action on the basis of deficient medical care, a plaintiff must set forth allegations of "an objectively serious medical condition and an official's deliberate indifference to that condition." Id. (citation omitted). A serious medical condition exists when the condition "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). "Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez, 792 F.3d at 766-67 (citation omitted). The Seventh Circuit has articulated the requisite mental state as "subjective recklessness." Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996) (quoting Farmer v. Brennan, 511 U.S. 825, 839 (1994)) (quotation in original). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Id. (quoting Farmer, 511 U.S. at 837). A prison official must be personally responsible for the constitutional violation. Gentry v. Duckworth, 65 F.3d 555, 561

(7th Cir. 1995) (citation omitted). Personal responsibility is found where "the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent." Id. (internal citations and quotation marks omitted) (alteration in original).

Hardy contends that Plaintiff fails to establish Hardy's personal responsibility for Plaintiff's alleged constitutional deprivation. Plaintiff argues that the Seventh Circuit's recent decision in Perez v. Fenoglio compels the survival of his claim. In Perez, the plaintiff suffered a torn ligament, dislocation of his thumb, tissue damage, and a "gaping wound" between his thumb and index finger. Perez, 792 F.3d at 774. On the date of the injury, no physician was on duty, so a nurse wrapped the hand with gauze but could not provide pain killers because she was not a licensed physician. Id. The next day, a doctor at the prison infirmary explicitly recognized the severity of the injury, stating that the plaintiff needed to go to an outside hospital to see a hand surgeon. Id. Several days later, the plaintiff saw a physician's assistant at an outside care clinic who diagnosed him with a "large soft tissue tear," a probable right thumb MCP [metacarpophalageal] joint subluxation/dislocation with a possible ligament tear, a laceration from the web-space of the hand to the base of the thumb, and a gaping wound. Id. at 775 (quotation marks in original). It was again determined that the plaintiff needed "surgical revision" or "secondary intention." Id. (quotation marks in original). The physician's assistant ordered that the plaintiff receive dressing changes two times per day, cleanings with hydrogen peroxide, possible splinting or casting, and a follow up appointment to check the wound the next week. Id. The prison officials failed to heed these care instructions, and they did not take the plaintiff to his follow-up appointment. Id. This prompted the plaintiff to file a grievance requesting a return to the clinic. Id.

Seven months after his initial visit, the plaintiff was brought back to the care clinic, where another doctor provided an examination. Id. After diagnosing him with an obvious thumb subluxation, hyperextension of a thumb joint, and laxity of the radial collateral ligament, the doctor stated that the plaintiff could opt for surgery or "'live with it' and have a Thermoplast spica splint custom made for his hand." Id. The doctor also instructed that the prison should schedule therapy in the event that the plaintiff elected the splint option. Id. After the care clinic doctor's recommendations were forwarded to the prison doctor, the prison doctor provided an Ace Bandage and told the plaintiff that would be his custom thumb splint. Id. The plaintiff filed another grievance regarding the seven month delay between care clinic visits and requesting the surgery or the proper splint. Id. at 776. At the next care clinic visit, the doctor told the plaintiff and prison officials that joint fusion was the only surgical option. Id. After surgery, the Plaintiff sent a "'resident request' [to the warden], asking for assist[ance] in obtaining a resolution to [his] grievance." Id. (second alteration in original). The plaintiff never received a response, and his administrative appeal went unanswered. Id.

It is true that the Perez court stated that a prison official may be deliberately indifferent by delaying the treatment of a prisoner if it exacerbates the prisoner's condition or prolongs his pain unnecessarily. Id. at 781 (citation omitted). In fact, just a few days' delay in addressing the prisoner's condition can constitute deliberate indifference depending upon the severity of the condition. Id. (citing Edwards v. Snyder, 478 F.3d 827, 831-832 (2007). A correspondence to a prison administrator may provide a basis for personal liability if that correspondence supplies sufficient knowledge of a constitutional deprivation, id. at 782, but there is no ironclad rule that any prisoner communication to a prison official provides adequate notice to that official of a constitutional violation. Vance, 97 F.3d at 993. As such, the plaintiff maintains the burden of

showing that his communication, "in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." Id. (internal citations and quotation marks omitted). In Perez, the court found that the plaintiff alleged sufficient facts against a group of grievance officials, including the warden, through "coherent and highly detailed grievances and other correspondences." Id.

Plaintiff in this case fails to allege facts to demonstrate that Hardy had information sufficient to alert him to an excessive risk to Plaintiff's safety of health or that Hardy abdicated duties within his scope of responsibility. As an initial distinction, the correspondence to the warden in Perez was not a grievance to obtain immediate medical care. As noted above, the plaintiff there instead sent a "resident request" to the warden, in which he sought assistance with the administrative process of resolving his previously filed and unanswered grievance. Id. at 776 (quotation in original). The Perez plaintiff thus sought action from the warden that fell within his realm of administrative dominion.

Here, the grievance at issue specifically related to Hardy's alleged responsibility for Plaintiff's direct healthcare rather than the resolution of an unanswered grievance. The Complaint, however, does not demonstrate that Hardy failed to carry out his responsibility as Warden with respect to Plaintiff's condition. On its face, the Complaint explicitly acknowledges that during a lockdown—which was in place during the events at issue—that "it is the responsibility of the *Lockdown Coordinator* [not the warden] to ensure that inmates have access to healthcare." Compl. ¶ 16 (emphasis added). Plaintiff also states that, in general, "health care staff at Stateville, including Wexford employees, are responsible for responding to inmate sick call requests," id. at ¶ 14, and "[h]ealth care staff at Stateville, including Wexford employees, are also responsible for immediately reviewing emergency medical requests, and ensuring that

inmates are timely seen by an appropriate medical professional." Id. at ¶ 15. The only allegation pertaining to Hardy's responsibility with respect to Plaintiff's single emergency grievance—the class of grievance Plaintiff directed to Hardy on July 20, 2012—explains that Hardy, as Warden, had to make a determination as to whether the grievance warranted emergency processing. Id. ¶ 47. Hardy would have known from visiting Plaintiff in the infirmary on July 17, 2012 that Plaintiff had been treated that day, just three days prior to filing the emergency grievance. As such, the Complaint does nothing to suggest Hardy had a subjectively reckless state of mind, and the allegations fail to negate the equally plausible inference that Hardy determined that the emergency grievance did not warrant emergency processing.

The generic nature and lack of detail contained in the one grievance sent to Hardy further demonstrates that Plaintiff cannot meet the subjective recklessness element of his claim. The Perez court reasoned that the defendants obtained actual knowledge of the plaintiff's serious medical condition through the plaintiff's "coherent and highly detailed" communications. Perez, 792 F.3d 782. Here, conversely, Plaintiff provides threadbare assertions regarding Hardy's minimal contact with Plaintiff and the sole generic grievance sent to Hardy on July 20, 2012. Regarding the emergency grievance, the Complaint states that the grievance contained Plaintiff's description of the fall, his treatment at the Health Care Unit, that he was informed that his headache and pain may last seven to eight weeks, and that the grievance explained that he was not given medication upon leaving the Health Care Unit and his crutch was taken from him. Hardy allegedly waited nearly a month and a half to respond to this grievance. The Complaint does not include any elaboration on the aforementioned components of the grievance, and no other grievance was provided to Hardy. See Gentry, 65 F.3d at 561 (generously construing *pro se* pleadings and vacating grant of summary judgment because although plaintiff's filings were

"sometimes opaque and often confusing," the superintendent of reformatory could have known of constitutional deprivation due to the "*many* letters" sent to him) (emphasis added). Simply stated, one grievance complaining of headaches and pain do not reflect an objectively serious condition absent further detail.

To that end, Plaintiff makes no specific factual allegations as to why not receiving continued medication upon leaving the Health Care Unit, headaches, or the need for a crutch should have or actually did put Hardy on notice of a serious medical condition. Without such factual allegations, the mere lack of medication upon leaving the Health Care Unit, the existence of headaches, and a request for a crutch could not be expected to put Hardy on notice that a serious medical condition existed. See Vance, 97 F.3d at 992-994 (affirming summary judgment and noting that the warden was not directly involved in the procurement of plaintiff's medical care) ("More importantly, [the plaintiff] does not supply, in her description of the purported letter [to the warden], any detail to permit the conclusion that the letter sufficiently advised the warden of the situation to require [the warden's] intervention."); see also Jones v. Chicago, 856 F.2d 985, 992 (7th Cir. 1998) ("[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under section 1983.").

To be clear, this is not to say Plaintiff did not have a serious medical condition. Rather, based on the information available to Hardy, such a condition would not have been evident. From Hardy's standpoint, Plaintiff appeared to be receiving treatment when Hardy visited Plaintiff at the infirmary. The one grievance directed to Hardy came in close temporal proximity—just three days subsequent—to date of the injury and infirmary visit. Hardy never received a grievance stating that Plaintiff was not receiving follow-up treatment; instead, those

23

grievances were sent to Dennis and the Health Care Unit. Thus, because the information at Hardy's disposal could not have demonstrated a serious medical condition, Hardy could not have been *deliberately* indifferent to a serious medical condition. See Vance, 97 F.3d at 991 (discussing subjective prong of culpable state of mind requirement). Rather, it was reasonable to conclude (and equally plausible) that the single "request[] [for] emergency review of [Plaintiff's] grievance" did not "warrant[] emergency processing." Compl. at ¶ 47. This is particularly evident because, unlike Dennis, the warden has vast array of responsibilities and must oversee the entire facility population of 1,648 inmates.[3] See Petties v. Carter, 836 F.3d 722, 730 (7th Cir. 2016) ("Of course, delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of treatment.").

Plaintiff fares no better on the basis of his encounter with Hardy at the infirmary. Plaintiff fell on July 17, 2012. Hardy visited Plaintiff at the infirmary that same day. But, the allegations go no further than stating conclusorily that "Hardy observed and became aware of the severity of [Plaintiff's] injuries." Compl. ¶ 33. This allegation, absent more, provides no specific factual basis from which any inference could be drawn that Hardy knew Plaintiff had been diagnosed by a physician with a condition mandating treatment or that Plaintiff had a condition obvious enough for a layperson to see the need for a doctor's attention. See Greeno, 414 F.3d at 653 (explaining that serious medical conditions are those that have been diagnosed by a physician as mandating treatment or one that is sufficiently obvious for a layperson to perceive the need for a doctor's attention). Accordingly, Plaintiff's allegations surrounding his

---

[3] https://www.illinois.gov/idoc/facilities/Pages/statevillecorrectionalcenter.aspx (listing present Stateville Correctional Center Population) (last visited 12/5/16).

encounter with Hardy in the infirmary do not contain the requisite specificity to sustain his claim. See Twombly, 550 U.S. at 556.

Unlike the warden in Perez, Hardy also eventually took action on the grievance. However, the Complaint gives no description whatsoever regarding what action Hardy eventually took from which an inference of impropriety could be drawn. Plaintiff furthermore fails to demonstrate how any delay on Hardy's part caused an exacerbation of Plaintiff's ailments, for Plaintiff admits that Dennis actually reviewed all four grievances that he submitted and forwarded them to the Health Care Unit.

Additionally, it is noteworthy that Perez dismissed the case with prejudice *sua sponte* on the initial screening of the plaintiff's pro se complaint and after denying the plaintiff's request for appointment of counsel. Perez, 792 F.3d at 774. The Seventh Circuit stated that such a dismissal was premature because, liberally construed, the complaint stated a claim. Id. Here, the Court liberally construed Plaintiff's initial complaint and allowed him to proceed with his claims. Moreover, the Complaint currently before this Court is an amended complaint crafted with the assistance of counsel. The factual allegations contained therein are thus not entitled to the same liberal construal as the original *pro se* complaint before the court in Perez.

Finally, Plaintiff states various allegations as to Hardy, which center on his awareness of various Stateville policies and practices and his authority to intervene with and modify such policies. However, as the preceding explains, the allegations fail to state that Hardy had personal knowledge of any potential constitutional violation of Plaintiff's rights. Hardy therefore could not have had any affirmative duty to intervene with or modify Stateville's policies on account of the handling of Plaintiff's grievances.

For the foregoing reasons, Plaintiff fails to state allegations sufficient to sustain a claim against Hardy because he cannot meet the personal involvement element of a deliberate indifference claim. The claim against Hardy is therefore dismissed.

### III. CONCLUSION

Plaintiff's claims against Wexford and Dennis are time-barred, as neither the equitable tolling doctrine nor the relation back doctrine applies in this case. Because none of claims against Wexford can proceed due to the statute of limitations, the Court need not reach Wexford's argument that Count II of the Complaint is dismissed on the basis that *respondeat superior* does not apply to § 1983 actions. As to Hardy, Plaintiff fails to allege facts sufficient to sustain a claim for deliberate indifference. Accordingly, for the foregoing reasons, both Wexford and the IDOC Defendants' motions to dismiss are granted. Plaintiff may proceed with his claims against the remaining Defendants.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: December 13, 2016